BRADLEY W. PALMER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 62652. Promulgated April 30, 1935.

*A. Mitchell Palmer, Esq., William D. Harris, Esq.,* and *Francis V. Barstow, Esq.,* for the petitioner.

*F. R. Shearer, Esq.,* and *E. L. Updike, Esq.,* for the respondent.

OPINION.

SMITH: This is a proceeding for the redetermination of a deficiency in income tax for 1929 in the amount of $33,381.03. The allegations of error stated in the petition are as follows:

(a) The Commissioner erroneously disallowed as a capital net gain the amount received from the sale of stock rights received in respect of stock held by him more than two years, because the Petitioner included in his return the entire proceeds from the sale of the said rights and did not prorate the cost of the basic stock between the said stock and the said rights.

(b) The Commissioner erred in adding to the amount of taxable dividends reported by the Petitioner the sum of $160,115.50 on account of the issue to him by The American Superpower Corporation of Purchase Certificates or rights to purchase shares in The United Corporation and of The Commonwealth & Southern Corporation.

(c) The Commissioner also erred in adding to the amount of taxable dividends reported by the petitioner the sum of $135,115.50 on account of the issue to the petitioner by the American Superpower Corporation of Purchase Certificates or rights to purchase shares of The United Corporation.

In his answer the respondent—

* * * avers that in the event it be held and determined that the Commissioner did err in any respect as set forth in subparagraphs (b) and (c) of paragraph IV of the amended petition, then the Commissioner further erred in favor of the petitioner in the following respects:

(1) If said transactions did not represent corporate distributions, the Commissioner erred by overstating the cost or other basis to the petitioner of the stock of The United Corporation so acquired, and thereby understated the correct profit from the sale of 3,800 rights issued to the petitioner by The United Corporation subsequent to the transactions in question.

(2) If said transactions represented distributions, but the Commissioner erred in selecting the proper dates for valuing such distributions, then the Commissioner erred through understating the amount of petitioner's taxable dividends from those sources to the extent that the fair market value of such rights on dates other than those selected by the Commissioner exceeded the respective amounts determined by the Commissioner.

(3) If said transactions represented distributions, but the amounts thereof as determined by the Commissioner exceeded the accumulated earnings and profits of The American Superpower Corporation, then the Commissioner erred through failing to apply the provisions of subdivision (d) of Sec. 115 of the Revenue Act of 1928.

(4) If said transactions pertaining to stock of The United Corporation represented distributions governed by the provisions of Sec. 112 (g) of the Revenue

Act of 1928, then the Commissioner erred through failing to apply the provisions of Sec. 113 (a) (9) of that Act to petitioner's holdings of Superpower and United stock, and particularly in overstating the basis of 100 shares of Superpower stock and 3,800 United rights sold by petitioner later in the year 1929.

The respondent has accordingly moved to increase the deficiency, if any, which may arise from a redetermination of the tax liability in accordance with the Board's opinion.

The material facts have all been stipulated and, together with the exhibits referred to in the stipulation and filed at the hearing, are adopted as our findings by reference.

1. The petitioner as a stockholder of International Telephone & Telegraph Co. and of Electric Bond & Share Co. received from those corporations during 1929 rights to subscribe to additional shares of their stock. He sold such rights for $27,360 and reported the entire proceeds as income pursuant to the option contained in article 58 of Regulations 74, which, so far as pertinent, provides:

The taxpayer may at his option include the entire proceeds from the sale of stock rights in gross income, in which case the basis for determining gain or loss from the subsequent sale of the stock in respect of which the rights were issued shall be the same as though the rights had not been issued.

The respondent treated the entire sum as ordinary income, stating in his deficiency notice that " inasmuch as the cost of the basic stock was not prorated, the total selling price should be taxed at ordinary rates." The petitioner had held the shares of stock in respect of which the rights were issued for more than two years prior to the respective dates on which the rights were sold, and claims that the amount of $27,360 is a capital gain under section 101 of the Revenue Act of 1928.

Section 101 of the Revenue Act of 1928 deals with " capital net gains and losses." It defines a " capital gain " as the " taxable gain from the sale or exchange of capital assets consummated after December 31, 1921 ", and " capital assets " as " property held by the taxpayer for more than two years." The stipulated facts here show that the shares of stock in respect of which the rights in question were issued were owned and held by the petitioner for a period of more than two years at the date the rights were issued. Therefore, they constituted capital assets.

Were the rights issued on those shares of stock and received by the petitioner likewise capital assets?

In *Miles* v. *Safe Deposit & Trust Co. of Baltimore*, 259 U. S. 247, a stock subscription right was regarded as representative of a portion of the stockholder's original investment in the corporate enterprise. The Court stated:

The stockholder's right to take his part of the new shares therefore—assuming their intrinsic value to have exceeded the issuing price—was essentially analogous to a stock dividend. * * *

In General Counsel Memorandum 12942, Cumulative Bulletin XIII–1, p. 73, it was stated:

\* \* \* where stock rights are sold, in determining the period for which the taxpayer held the property there shall be included the period for which he held the stock in respect of which the rights were issued. That position not only finds support in the theory underlying *Miles* v. *Safe Deposit & Trust Co. of Baltimore, supra,* but also in section 101 (c) 8 (C), supra, as the issuance of stock rights may be said to effect (certainly in some, if not in all, cases) a recapitalization of a corporation, and thus the rights may be regarded as securities in the reorganized distributing corporation received without the surrender of the stock in respect of which distributed. In that event tacking is, of course, specifically authorized. However, while these considerations support the treatment of *rights* as capital assets, they do not justify such treatment of *stock* acquired through the exercise of rights, unless it is held for the period prescribed by the statute. \* \* \*

In *Lee* v. *Commissioner*, 76 Fed. (2d) 203, it was held that the date of acquisition of rights to subscribe to stock dates back to the date of acquisition of the stock and that where the stock was acquired more than two years from the date of the sale of the rights the gain must be treated as capital gain.

We think it clear from the stipulated facts that the issuance of the subscription warrants by the International Telephone & Telegraph Co. and the Electric Bond & Share Co. constituted a division among the stockholders of their capital interests in the corporations and that they stand on the same footing as stock dividends. See article 501 of Regulations 74. Since the shares of stock in respect of which the stock rights were issued had been held by the petitioner for a period of more than two years at the date of sale of the stock rights, the rights themselves constituted " capital assets." The contention of the petitioner that the net proceeds from the sale of the rights here in question amounting to $27,360 is taxable as capital net gain is sustained.

2. The principal question presented by this proceeding is whether the petitioner, a stockholder of the American Superpower Corporation (hereinafter called Superpower), derived any taxable income from the receipt of certain rights issued by Superpower to its stockholders entitling them to purchase from it shares of common stock in the United Corporation (hereinafter called United), and in the Commonwealth & Southern Corporation (hereinafter called Commonwealth), which were exercised by the petitioner. The respondent contends that the value of these rights received by the petitioner in the form of purchase certificates constituted taxable dividends within the meaning of the Revenue Act of 1928. The facts bearing upon this question are all covered in a lengthy stipulation of facts filed with the Board.

Superpower acquired 2,210,853 shares of common stock, 344,187 shares of $3 cumulative preference stock, and 1,000,000 option warrants (entitling the holder to purchase 1,000,000 shares of common stock at any time, without limit, at $27.50 per share), of United upon its organization in January 1929. United was organized for the purpose of bringing into a common ownership large holdings of public utility companies, principally the Public Service Corporation of New Jersey and United Gas Improvement Co. Superpower, J. P. Morgan & Co., Drexel & Co., and Bonbright & Co., were instrumental in its organization. For the United securities acquired by Superpower, Superpower turned over to United shares of stock of the Public Service Corporation of New Jersey and of the United Gas Improvement Co., and $25 cash. The fair market value of these shares thus contributed to United was $72,480,000 as determined by the respondent. The respondent likewise determined the fair market value of United securities received by Superpower to be the same amount, $72,480,000. He found the fair market value of United common stock received by Superpower to be $25 per share. J. P. Morgan & Co. and Bonbright & Co. each agreed to purchase and did purchase from United 400,000 shares of its common stock for cash at $22.50 per share.

At the time of the organization of United, Superpower contemplated selling a portion of the United common shares to be acquired by it to its stockholders. This was for the purpose of building up its cash position and of creating a wide market for the United stock. Soon after it received United common stock it offered to sell pro rata to the holders of its class A and class B common stock a one-half share of United common stock for each of its common shares outstanding, at $25 per share.

There proved to be a great demand on the part of the public for United common stock. The first series of rights issued by Superpower to its stockholders to purchase United common stock at $25 per share was actively dealt in on the New York Curb Exchange and ranged from a low of 11⅝ to a high of 21 from January 1, 1925, to February 15, 1929, when the rights expired. Superpower issued 1,642,944 rights on its 1,642,944 shares of class A and class B common stock, all of which rights were exercised on or before January 15, 1929, and Superpower thus disposed of 821,472 shares of its United common stock.

In May 1929 Superpower again offered to sell pro rata to its stockholders United common shares at $30 per share. These rights likewise found a ready sale. Practically all of them were exercised and Superpower disposed of more than 400,000 additional shares of United common stock.

In May or June 1929 Superpower acquired, partly by purchase and partly in a nontaxable exchange, certain shares of common stock of Commonwealth. On June 5, 1929, the directors of Superpower took action in reference to a portion of its holdings in Commonwealth similar to that taken in January and in May with respect to United common stock. By resolutions then adopted the holders of its common stock of record on June 18, 1929, were granted the right to acquire shares of Commonwealth common stock at $15 per share and at the rate of one share of Commonwealth stock for every 10 shares of Superpower common stock (Superpower common stock having a little earlier been split five for one). These rights were likewise valuable. Under the resolution of June 5, 1929, Superpower issued 8,242,310 rights for the purchase of Commonwealth common stock, of which 8,237,480 were exercised on or before July 2, 1929.

At the beginning of 1929, the petitioner was the owner of 3,796 shares of class A and 2,600 shares of class B common stock of Superpower. During the year 1929 the petitioner received purchase certificates from Superpower as follows:

1. On February 1, 1929, purchase certificates entitling the petitioner to purchase on or before February 15, 1929, 3,198 shares of common stock of United at a price of $25 per share.

2. On May 15, 1929, purchase certificates entitling petitioner to purchase on or before May 24, 1929, 1,599 shares of common stock of United at a price of $30 per share.

3. On June 24, 1929, purchase certificates entitling the petitioner to purchase on or before July 2, 1929, 3,200 shares of common stock of Commonwealth at a price of $15 per share.

On February 15, 1929, the petitioner exercised his option under the first purchase certificates and purchased from Superpower 3,198 shares of United common stock and paid therefor in cash $79,950, or at the rate of $25 per share, concurrently surrendering his first purchase certificates. The cost to Superpower of the 3,198 shares of United common as determined by the respondent was $8.949 plus per share and Superpower received from the sale a profit of $16.05 plus per share, total $51,327.90.

On May 24, 1929, petitioner exercised his option under the second purchase certificates and received from Superpower 1,599 shares of United common stock and paid therefor in cash $47,970, or at the rate of $30 per share, concurrently surrendering his second purchase certificates. Superpower realized a profit from the sale of approximately $20 per share, total $33,578.95.

On July 2, 1929, the petitioner exercised his option under the third set of purchase certificates and acquired from Superpower 3,200 shares of Commonwealth common, paying therefor in cash $48,000, or at the

rate of $15 per share, concurrently surrendering the third set of purchase certificates. Superpower received a profit from the sale of $2,912.

In his income tax return for 1929 the petitioner did not include the receipt of the purchase certificates as income. The respondent has held, however, that the petitioner received taxable dividends represented by the value of the purchase certificates received from Superpower entitling him to purchase shares of common stock of United and Commonwealth at what the respondent contends were bargain prices.

Section 115 of the Revenue Act of 1928 provides in part:

(a) *Definition of dividend.*—The term " dividend " when used in this title * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913.

(b) *Source of distributions.*—For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the basis of the stock provided in section 113.

(c) *Distributions in liquidation.*—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. * * *

(d) *Other distributions from capital.*—If any distribution (not in partial or complete liquidation) made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not out of earnings or profits, then the amount of such distribution shall be applied against and reduce the basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. The provisions of this subsection shall also apply to distributions from depletion reserves based on the discovery value of mines.

*       *       *       *       *       *       *

(f) *Stock dividends.*—A stock dividend shall not be subject to tax.

The stipulated facts negative the idea that Superpower had any intention of distributing to its stockholders any of its earnings or any of its assets by the sale of certain shares of common stock of United and of Commonwealth to its stockholders. The resolutions of the board of directors of Superpower relating to these sales do not refer to them as dividends or as distributions of its assets. In its books of account the sales are treated as sales of assets and not otherwise. It is stipulated that " on its books of account The American Superpower Corporation made no charge against nor deduction from its profits and loss or earnings account, its earned surplus ac-

count, or its paid-in surplus account, in connection with or as a result of the issuance of the 'Purchase Certificates' pursuant to the provisions of the aforesaid resolutions of January 23, 1929, May 1, 1929, and June 5, 1929."

As above indicated, the stipulated facts show that the respondent determined the "total fair market value" of all the securities received by Superpower from United in January 1929 to be $72,480,000. He allocated this value to the three classes of securities received and determined the fair market value of the common shares to be $25 per share. This is the exact price at which Superpower offered the first block of 821,472 shares of common stock of United to its stockholders. No valid argument can be made that Superpower intended to distribute to its stockholders any portion of its assets by selling 821,472 common shares of United to them at a fair market value. Upon the sale of the stock at $25 per share Superpower realized a profit of $16.05 on each share.

That $25 was a fair market price for the stock in January 1929 is further evidenced by the fact that J. P. Morgan & Co. and Bonbright & Co., pursuant to the agreement made between the interested parties, each subscribed for and purchased from United 400,000 shares of its common stock at $22.50 per share.

The stipulated facts do not show the fair market value of United common stock in May 1929, or of Commonwealth common stock in June and July 1929. The sales of United common in May 1929 were made at $30 per share, or at $5 per share more than the price at which the stock was offered to Superpower's stockholders in January. The Commonwealth stock was acquired by Superpower just before it was offered for sale by Superpower to its stockholders. In selling it at $15 per share Superpower made a profit on each share sold.

The decided weight of legal authority is to the effect that where a corporation issues to its stockholders rights to purchase shares of its own stock or of its bonds, or, indeed, to purchase assets owned by it, the stockholders do not receive taxable income either from the receipt of the rights or from the exercise thereof. In *Miles* v. *Safe Deposit & Trust Co. of Baltimore, supra*, the Supreme Court held that the distribution to its stockholders by a corporation of rights entitling them to subscribe for new shares of its own stock " in and of itself constituted no division of any part of the accumulated profits or surplus of the company, or even of its capital ", and that the privilege to subscribe to the new stock " of itself was not a fruit of stock ownership in the nature of a profit; nor was it a division of any part of the assets of the company." The Court further stated:

* * * What would have happened had defendant in error decided to accept the new shares and pay the issuing price instead of selling the rights is of no consequence; in that event there would have been no realized profit, hence no taxable income. * * *

This Board has held that a stockholder who receives a valuable right for the purchase of bonds of the corporation of which he is a stockholder and exercises the right does not thereby realize taxable income. *T. I. Hare Powel*, 27 B. T. A. 55; *Robert C. Cooley*, 27 B. T. A. 986; affirmed on another issue, 75 Fed. (2d) 188; *Edward S. Harkness*, 31 B. T. A. 1100. The Board has also held that where a stockholder has received rights to purchase shares of stock in the issuing corporation and those rights became worthless in his hands, the stockholder does not have a legal claim of loss of the value of the rights as of the date of receipt by him. *St. Louis Union Trust Co. et al., Co-trustees*, 30 B. T. A. 370. It has been held further that, where a stockholder of a corporation receives from the corporation valuable rights to purchase shares of stock subscribed for by such corporation and the stockholder exercises such rights, he does not receive taxable income; *J. Kemp Bartlett*, 28 B. T. A. 285; affd., *Helvering* v. *Bartlett* (C. C. A., 4th Cir.), 71 Fed. (2d) 598; also, that where a corporation gives a stockholder a right to purchase property at less than its market value and such right is exercised by the stockholder, the stockholder has not realized taxable income. *Taplin* v. *Commissioner*, 41 Fed. (2d) 454; *Commissioner* v. *Van Vorst*, 59 Fed. (2d) 677, affirming *George W. Van Vorst, Executor*, 22 B. T. A. 632. Cf. *Samuel A. Salvage* v. *Commissioner*, 76 Fed. (2d) 112.

Article 51 of Regulations 74, promulgated under the provisions of the Revenue Act of 1928, provides in part:

Where property is sold by a corporation to a shareholder, or by an employer to an employee, for an amount substantially less than its fair market value, such shareholder of the corporation or such employee shall include in gross income the difference between the amount paid for the property and the amount of its fair market value. In computing the gain or loss from the subsequent sale of such property its cost shall be deemed to be its fair market value at the date of acquisition by the shareholder or the employee. This paragraph does not apply, however, to the issuance by a corporation to its shareholders of the right to subscribe to its stock, as to which see article 58.

In *Irving D. Rossheim*, 31 B. T. A. 857, 865, we stated:

\* \* \* Article 51 is the successor to, and is identical with, article 31 of Regulations 65 and 69, interpreting corresponding provisions of the 1924 and 1926 Acts, respectively. It should also be noted that article 31 of Regulations 65 and 69 and article 51 of Regulations 74 were first promulgated by the Treasury Department as Treasury Decision 3435, and thereafter appeared as a part of Regulations 65, 69, and 74.

Treasury Decision 3435 has been carefully considered by the courts in *Taplin* v. *Commissioner*, 41 Fed. (2d) 454; and *Commissioner* v. *Van Vorst*, 59 Fed. (2d) 677, affirming *George W. Van Vorst, Executor*, 22 B. T. A. 632, and by the Board in the latter case and in *James William Everhart*, 26 B. T. A. 318. These cases and authorities therein cited adequately support the view that article 51 of Regulations 74 cannot create income where none, in fact, exists when measured by the statutory definition of gross income. \* \* \*

This observation is equally applicable to this proceeding.

In support of his contention that the issuance of the purchase certificates by Superpower constituted a dividend the respondent cites *Metcalf's Estate* v. *Commissioner* (C. C. A., 2d Cir.), 32 Fed. (2d) 192, affirming 13 B. T. A. 236. The court stated in that case: "The question presented is whether, by the selling of these rights, the petitioner received taxable income, under section 211 of the Revenue Act of 1921." In the course of its opinion the court stated:

Thus, where a stockholder receives a distribution of the assets of a corporation in cash or in stock of a different enterprise, such distribution is for taxing purposes a dividend. No sound distinction can be drawn between a distribution of stock of another corporation and one of valuable rights to purchase such stock. Each may be sold at its selling price. The rights this petitioner sold netted $18 per right. They amounted to a distribution of assets of the company of which it was a stockholder, just as much as an actual distribution of stock of the Baltimore & Ohio Railroad by the Union Pacific Company did in the *Peabody Case*. There was a distribution in specie of a portion of the assets of the Southern Pacific Company. A distribution of earnings or assets of a corporation is a distribution, whether or not so determined.

The facts in that case were in short that the Southern Pacific Co., which owned valuable oil lands, deemed it expedient to dispose of them. As a means of so doing it organized Pacific Oil Co., to which it transferred the oil lands and cash, and then distributed the stock to its stockholders share for share upon the payment by each stockholder of $15 to reimburse it for advances which it had made to the Pacific Oil Co. This Board and the court held that the distribution of the Pacific Oil Co. stock in such circumstances constituted a distribution of property and that the petitioner realized taxable income from the sale of the rights equal to the net proceeds from the sale.

In *Helvering* v. *Bartlett, supra,* the question before the court was whether rights issued by a corporation entitling it to purchase shares of stock in another corporation constituted dividends to the amount of the fair market value of the rights received by the stockholder. The Board held that the taxpayer had realized no taxable profit or dividend because of the allotment to him of the rights in question. The court in its opinion stated:

We think that this holding of the Board was clearly right. We are not dealing with a case where a stockholder who has received rights to purchase stock sells the rights and thus realizes a profit. If the taxpayer here had sold the rights allotted him, the amount received on such sale would, of course, have been taxable as income. *Miles* v. *Safe Deposit Co.*, 259 U. S. 247; *Metcalf's Estate* v. *Commissioner*, (C. C. A. 2nd) 32 Fed. (2d) 192. But he did not sell the rights. He exercised the option which they conferred upon him to purchase stock in the fire company; and he has as yet realized no profit upon this transaction. The rights were nothing but options to purchase stock, and the fact that they were allotted to stockholders of the Guaranty Company did not make them in any sense dividends. An option is but a continuing offer; and, when

the offer is accepted, it is merged in the contract which results. We have, then, nothing upon which to predicate an assessment of the tax but a purchase of stock by the taxpayer; and it is well settled that such a transaction does not give rise to taxable income until a profit is realized by the sale of the stock purchased. The taxing statutes are not based upon the theory that a man can " buy himself rich."

\* \* \* \* \* \* \*

\* \* \* All that the Guaranty Company did was to acquire in behalf of its stockholders options to subscribe to stock in the Fire Company and to allot these options to them in accordance with their holdings; and it seems clear that one is not to be taxed as upon income merely because he acquires an option which he might sell for value. \* \* \*

\* \* \* No profit is realized upon a purchase; and the mere according of a right to purchase is not to be treated as a dividend or distribution of assets, unless these are in fact involved and the right to purchase is a mere cloak for a transaction which is essentially something else.

\* \* \* A different situation would, of course, be presented if the Guaranty Company had transferred assets to the Fire Company and a preferential right to purchase stock at less than its real value had been accorded the stockholders of the former; for this would amount to a distribution of assets by the Guaranty Company to the stockholders who exercised the right to purchase. But that is not the situation here, and there is nothing to indicate that the formation of the Fire Company was in any sense a *cloak for the payment of a dividend or the distribution of assets.* [Italics supplied.]

Was the issuance of purchase certificates by Superpower " a cloak for the payment of a dividend "? For reasons set forth above we are of the opinion that it was not.

The normal application of the statute to the facts of this case is that the stockholder derives no taxable income either from the receipt of rights to purchase stock at a fair price or from the exercise of those rights. It is only when the circumstances are such that the issuance of the rights is tantamount to the payment of a dividend or a distribution of assets in the form of a property dividend that the value of the rights may be regarded as a dividend. See *Metcalf's Estate, supra; Nanaline H. Duke,* 18 B. T. A. 374.

If a stockholder receives rights and sells them he may have income from the sale of the rights—not from the receipt of them. If, on the other hand, he exercises the rights and later sells the stock or other assets acquired by the exercise of such rights he has a gain or loss from the sale measured by the difference between the selling price and the cost or other basis to him of the property sold.

Upon the entire record we are of the opinion that the petitioner realized no taxable income from the receipt of the purchase certificates involved in this proceeding or from the exercise of them in the purchase of shares of stock of United and Commonwealth. There is no reason to give to the transaction a different interpretation from that placed upon it by both Superpower and the petitioner. Superpower treated the transaction solely as a sale of a portion of its

assets and accounted for the profit realized therefrom. The petitioner likewise treated the transaction as a purchase of shares of stock for cash. If and when he shall sell the shares acquired by him the profit or loss must be predicated upon the basis of the price that he paid for them.

Upon this disposition of the case it is unnecessary to consider the third question presented by this proceeding.

The respondent is entitled to a redetermination of the profit realized by the petitioner from the sale of 3,800 of United stock rights. *Safe Deposit & Trust Co. of Baltimore, supra.* It was stipulated at the hearing of this proceeding that this matter could be settled from the stipulated facts under Rule 50 of the Boards Rules of Practice.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*